PODEA v. ACHESON, Secretary of State of United States.

No. 100, Docket 21475.

United States Court of Appeals Second Circuit.

Argued Dec. 14, 1949.

Decided Jan. 10, 1950.

John W. Burke, Jr., New York City, attorney for Titus Livius Podea, Plaintiff-Appellant; Ralph C. Busser, Philadelphia, Pa., and William T. Love, Jr., New York City, Counsel.

J. Vincent Keogh, United States Attorney, Brooklyn, N. Y., for Dean Acheson, as Secretary of State of the United States of America, Defendant-Appellee; Nathan Borock, Assistant United States Attorney, Brooklyn, N. Y., Counsel.

Before AUGUSTUS N. HAND, CHASE and CLARK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The plaintiff brought this action under Section 503 of the Nationality Act of 1940, which provides as follows:

"If any person who claims a right or privilege as a national of the United States is denied such right or privilege by any Department or agency, or executive official thereof, upon the ground that he is not a

national of the United States, such person, regardless of whether he is within the United States or abroad, may institute an action against the head of such Department or agency in the District Court of the United States for the District of Columbia or in the district court of the United States for the district in which such person claims a permanent residence for a judgment declaring him to be a national of the United States. If such person is outside the United States and shall have instituted such an action in court, he may, upon submission of a sworn application showing that the claim of nationality presented in such action is made in good faith and has a substantial basis, obtain from a diplomatic or consular officer of the United States in the foreign country in which he is residing a certificate of identity stating that his nationality status is pending before the court, and may be admitted to the United States with such certificate upon the condition that he shall be subject to deportation in case it shall be decided by the court that he is not a national of the United States. Such certificate of identity shall not be denied solely on the ground that such person has lost a status previously had or acquired as a national of the United States; and from any denial of an application for such certificate the applicant shall be entitled to an appeal to the Secretary of State, who, if he approves the denial, shall state in writing the reasons for his decision. The Secretary of State, with approval of the Attorney General, shall prescribe rules and regulations for the issuance of certificates of identity as above provided." 54 Stat. 1171, 8 U.S. C.A. § 903.

The trial judge dismissed the complaint on the ground that the plaintiff, though born a citizen of the United States, voluntarily expatriated himself and for that reason was not entitled to the judgment which he seeks, under Section 503, supra, declaring him to be a citizen. We hold that the decision that he voluntarily expatriated himself was erroneous and that the judgment must, therefore, be reversed.

Section 401 of the Nationality Act of 1940 further provided as follows:

"§ 401. A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by:

\*　　\*　　\*　　\*　　\*　　\*

(b) Taking an oath or making an affirmation or other formal declaration of allegiance to a foreign state; or

"(c) Entering, or serving in, the armed forces of a foreign state unless expressly authorized by the laws of the United States, if he has or acquires the nationality of such foreign state; \* \* \*." 54 Stat. 1168, 1169, 8 U.S.C.A. § 801.

The Nationality Act first went into effect January 13, 1941, but the Act of 1907 was in effect during most of the time embraced in the case at bar.

It was provided in Chapter 2534 of the Act of 1907, 34 Stat. 1228:

"Sec. 2. That any American citizen shall be deemed to have expatriated himself \* \* \* when he has taken an oath of allegiance to any foreign state."

The provisions of the Nationality Act which we have quoted above were in part reenactments of the Act of 1907 which we have referred to.

The question before us is whether Podea, a native-born citizen of the United States, expatriated himself by reason of his conscription into a foreign army and consequent taking of an oath of allegiance to a foreign sovereign.

Podea was born in Youngstown, Ohio, on September 12, 1912. His parents had emigrated to America from Austria-Hungary but had remained citizens of that country. In 1921 they returned to the Province of Transylvania in Roumania, the place of their origin, and brought their son with them. While in Ohio he attended the Youngstown public schools and on his removal to Roumania with his parents went to a high school there and later graduated from the University of Cluj. In 1934 he was ordered by the Roumanian military authorities to appear for registration. After registration he received a two years deferment of induction on the ground that he wished to finish his studies. In July 1931 he applied to the American Con-

308

sul at Bucharest for a passport to the United States, took the oath of allegiance, stated in his application that since July 1921 he had temporarily resided in Roumania for the purpose of obtaining an education but intended to return to the United States within one year and a half to live there permanently. At the time of this application he had already been registered by the Roumanian military authorities, without any action on his part, as available for conscription. He informed the Consul of the claim of those authorities that he was a Roumanian citizen subject to military duty, and of his consequent need of a passport to establish his American citizenship and non-liability to conscription. It was a criminal offense in Roumania to claim other nationality in order to escape conscription and to fail to sustain the claim. In 1934 the plaintiff received a ruling that he had lost his American citizenship because of the registration of his father as a Roumanian. This ruling was erroneous. On January 27, 1936, the plaintiff filed a second application for a passport at the Consulate in Bucharest in which he took another oath of allegiance and in April 1936 he was informed that this application was denied on the same ground as the prior one had been.

In October, 1936, the plaintiff was inducted into the Roumanian army, and as an incident thereof, took an oath of allegiance to the King of Roumania along with four or five hundred other conscripts, and thereafter served in the Roumanian army until October 1937, when he was placed on the military reserve list and continued to reside in Roumania. In the winter of 1938 he again visited the American Consulate in Roumania and asked if any new efforts might result in granting him an opportunity to return to the United States, to which it was replied that he had taken an oath of allegiance to a foreign government. In 1939 he obtained an American visa based on a Roumanian passport in order to cover the World's Fair in New York as a Roumanian newspaper reporter. On May 29, 1939, the Supreme Court held in Perkins v. Elg, 307 U.S. 325, 59 S.Ct. 884, 83 L.Ed. 1320, that a child born in the United States

did not lose his citizenship by reason of his parents' resumption of their former allegiance. On the occasion of his visit to America to report on the World's Fair, the plaintiff called at the State Department, discussed with an official there his citizenship status, and was advised that he was not an American citizen, but should reenter through another country and establish permanent residence as an immigrant. He returned to Roumania late in 1939, and in June 1941 was again inducted into the Roumanian army, where he served until October 1941. The trial judge found that the plaintiff, at the time of his return to Roumania, knew that he could again be inducted into service there since he was a reserve officer in the Roumanian army. On December 31, 1941, he married an American citizen, after which he applied for and obtained a visa from the American Consul under which he left Roumania and arrived in the United States in June 1942. In May 1946 he again applied to the State Department for an American passport, which was denied on the ground that he had lost his citizenship.

The defendant contends that Podea's oath of allegiance to the King of Roumania in 1936 and his re-entry into the Roumanian army in 1941 were not involuntary, and therefore were not acts caused by duress which would negative expatriation. If there was duress, no loss of citizenship would result and so the Court of Appeals for the First Circuit held in Dos Reis ex rel. Camara v. Nicolls, 161 F.2d 860, in an opinion by Judge Magruder. See also Perkins v. Elg, supra, 307 U.S. at page 334, 59 S.Ct. 884. When the plaintiff was refused a passport by the State Department he was compelled to serve in the Roumanian army in 1936 and could not return to America until he completed his military service and could obtain a Roumanian passport on the theory that he was a Roumanian citizen—as our government said he was. He obtained that passport because of the ruling of our State Department that he was a Roumanian citizen, and without it he could neither have come to America temporarily to pursue his calling as a newspaper reporter, nor as a tempor-

ary visitor. For many years he had vainly sought to obtain a passport from the State Department which was denied him under a mistake of law. If he had come in as an immigrant on the Roumanian quota, he might have had to meet the claim that he had conceded Roumanian citizenship and be confronted by a concession of serious if not fatal character. See Schaufus v. Attorney General, D.C., 45 F.Supp. 61, 65. If he had remained in this country under his visa he ran the risk of being deported for either an illegal entry or an illegal overstay. Sleddens v. Shaughnessy, 2 Cir., 177 F.2d 363. It seems most technical to hold that the plaintiff did not act under duress. In our opinion he never voluntarily expatriated himself by taking an oath of allegiance to Roumania or by serving in the Roumanian army. Both steps were required by the situation in which he found himself, were primarily caused by the erroneous advice of the State Department and were farthest from his real purpose.

For the foregoing reasons the judgment of the District Court is reversed and the cause remanded with direction to enter a judgment declaring that the plaintiff is a native born citizen of the United States entitled to all the rights and privileges of such a citizen.