**LEHMANN v. ACHESON.**

No. 11035.

United States Court of Appeals Third Circuit.

Argued June 17, 1953.

Decided July 29, 1953.

Henry A. Craig, Philadelphia, Pa. (Owen F. McLane, Philadelphia, Pa., on the brief), for appellant.

Morton M. Fine, Asst. U. S. Atty., Philadelphia, Pa. (Joseph G. Hildenberger, U. S. Atty., Philadelphia, Pa., on the brief), for appellee.

Before MARIS, McLAUGHLIN and KALODNER, Circuit Judges.

594

KALODNER, Circuit Judge.

The question presented by this appeal is whether plaintiff below, Albert Hermann Lehmann, a native-born citizen of the United States, expatriated himself by reason of his conscription into a foreign army and incidental taking of an oath of allegiance to a foreign sovereign.[1]

■ The District Court found as a fact[2] that expatriation had taken place. With respect to that finding it must immediately be noted that it was in the nature of an ultimate finding of fact and on that score it is well settled that such a finding is but a legal inference from other facts[3] and as such is subject to review free of the restraining impact of the so-called "clearly erroneous" rule applicable to ordinary findings of fact by the trial court.[4]

Our problem then, in short, is to determine whether the evidence on which the District Court premised its ultimate finding of fact of expatriation measures up to the applicable legal standard of proof.

The pattern of this case is not unfamiliar to the courts. In its broad aspects it presents a situation where a young man who was born in the United States of Swiss parentage and by virtue of that fact acquired dual nationality under the laws of the United States and Switzerland, was conscripted into the Swiss Army in accordance wih its laws and as a result was ruled to have suffered loss of his American citizenship under the provisions of Section 401 of the Nationality Act of 1940, 8 U.S.C.A. § 801.

Section 401 of the Nationality Act of 1940 provides as follows:

"A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by:

\*   \*   \*   \*   \*.   \*

. "(b) Taking an oath or making an affirmation or other formal declaration of allegiance to a foreign state; or

"(c) Entering, or serving in, the armed forces of a foreign state unless expressly authorized by the laws of the United States, if he has or acquires the nationality of such foreign state; \*  \*  \*."

■ "Expatriation is a voluntary renunciation or abandonment of nationality and allegiance." Perkins v. Elg, 1939, 307 U.S. 325, 334, 59 S.Ct. 884, 889, 83 L.Ed. 1320.

■ Conscription into the Army of a foreign government of one holding dual citizenship is sufficient to establish prima facie that his entry and service were involuntary. Perri v. Dulles, 3 Cir., 206 F. 2d 586.

■ It is well settled that expatriation under Sec. 401(c) is "limited to cases where the induction into the foreign military service may be said to have been voluntary." Dos Reis v. Nicolls, 1 Cir., 1947, 161 F.2d 860, 861; Podea v. Acheson, 2 Cir., 1950, 179 F.2d 306; Pandolfo v. Acheson, 2 Cir., 1953, 202 F.2d 38; Cf. Tomaya Kawakita v. United States, 1952, 343 U.S. 717, 72 S.Ct. 950, 96 L.Ed. 1249.[5]

1. Plaintiff brought an action for a declaratory judgment under Section 503 of the Nationality Act of 1940, 8 U.S.C.A. § 903, petitioning for a judgment declaring him to be a citizen of the United States.

2. The District Court did not make specific Findings of Fact, merely stating at the conclusion of its opinion, D.C.E.D. Pa., 1953, 109 F.Supp. 751, 755, that "The foregoing discussion includes my findings of fact in this case."

3. Baumgartner v. United States, 1944, 322 U.S. 665, 670, 671, 64 S.Ct. 1240, 88 L. Ed. 1525; Cf. The E. A. Packer, 1891, 140 U.S. 360, 11 S.Ct. 794, 35 L.Ed. 453.

4. Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.

5. Perri v. Acheson, D.C.N.J.1952, 105 F. Supp. 434; Mazza v. Acheson, D.C.N.D. Cal.1952, 104 F.Supp. 157; Paracchini v. McGrath, D.C.S.D.N.Y.1952, 103 F.Supp. 184; Noboru Kanbara v. Acheson, D.C.S. D.Cal.1952, 103 F.Supp. 565; Shigenori Morizumi v. Acheson, D.C.N.D.Cal. 1951, 101 F.Supp. 976; Noboro Kato v. Acheson, D.C.S.D.Cal.1950, 94 F.Supp. 415; Ozasa v. Acheson, D.C.S.D.Cal.1950, 94 F.Supp. 436; Tomasicchio v. Acheson, D.C.D.C.1951, 98 F.Supp. 166; Federici v. Clark, D.C.W.D.Pa.1951, 99 F.Supp.

In Doreau v. Marshall, 3 Cir., 1948, 170 F.2d 721, 723 we held, in construing the provisions of Sec. 401, that "the very essence of expatriation is that it be voluntary".

Having in mind these principles, we turn to an examination of the record in this case.

Lehmann was born June 2, 1921, in Philadelphia, Pennsylvania of parents who were Swiss nationals, thereby acquiring dual nationality under the laws of the United States and of Switzerland. In 1924, at the age of three years, he was taken by his mother to live in Switzerland, his father continuing to reside in the United States. The father was naturalized in Philadelphia some four years later, in 1928.

In 1939 when Lehmann was 18 years of age, he registered, in response to a summons, for service in the Swiss Army under the compulsory military service laws of that country. Had he ignored the summons to register he would have been subject to penal punishment under Swiss laws.

At the time (in 1939) Lehmann told the Swiss military authorities "I was born in the United States". In response to the question (on cross-examination) "Did you at that time make any protest whatsoever over your registration?" Lehmann answered "No, I didn't, not a formal protest, no." He made no further objection to his registration.

Early in 1941, several months before he was actually inducted into the Swiss Army, Lehmann went to the American consulate in Basel, Switzerland, where he was then resident, and "asked if there would be any way of getting to the United States, because I wanted to join the Air Force at that time." He was told that "due to the conditions of Europe, Switzerland was isolated more or less [6] * * * so I would have to do it on my own * * * he (the consulate official) couldn't possibly give me any assistance"; "no American consulate abroad dares recruit any soldiers, I would have to try to get to New York to enlist." He was also told "We don't enlist anybody here in the consulate." Lehmann also told the consulate "I am a United States citizen" but was unable to present a birth certificate since his mother "didn't know where it was either." (The birth certificate was later found amongst some papers). Further, Lehmann advised the consulate official "I have to go into the Army" (Swiss Army) and was told in reply "Well, I can't help you. You are on your own." He didn't specifically ask for help nor did he register as an American citizen. (There was no mention made of registration at this visit to the consulate.)

In July, 1941, several months after his visit to the American consulate, Lehmann, then 20 years old, was conscripted into the Swiss Army. He took an oath of allegiance to Switzerland several months later in November, 1941. At various intervals, during 1941, through 1945, and in 1947, Lehmann served a total of 511 days in the Swiss Army.

At the conclusion of World War II, desirous of visiting his father in America, Lehmann addressed a letter to the American consulate, dated December 10, 1945, inquiring under what conditions he could obtain a visa to the United States. He was advised that he had forfeited citizenship by serving in the Swiss Army, and therefore could not obtain a visa. In order to facilitate getting a visa, on April 17, 1946, he was issued a Certificate of Loss of Nationality of the United States by the American Vice Consul at Basel.[7] He made no further efforts to come to the United States.

1019; Toshio Kondo v. Acheson, D.C. S.D.Cal.1951, 98 F.Supp. 884; Di Girolamo v. Acheson, D.C.D.C.1951, 101 F. Supp. 380; Yoshiro Shibata v. Acheson, D.C.S.D.Cal.1949, 86 F.Supp. 1; Kanno v. Acheson, D.C.S.D.Cal.1950, 92 F.Supp. 183; Minoru Hamamoto v. Acheson, D.C. S.D.Cal.1951, 98 F.Supp. 904; Cantoni v. Acheson, D.C.N.D.Cal.1950, 88 F. Supp. 576; Ishikawa v. Acheson, D.C. Hawaii 1949, 85 F.Supp. 1; In re Gogal, D.C.W.D.Pa.1947, 75 F.Supp. 268; Schioler v. U. S., D.C.N.D.Ill.1948, 75 F. Supp. 353.

6. At the time of this visit World War II was in progress and as the District Court stated "Switzerland was completely surrounded by countries at war."

7. In accordance with Section 501 of the 1940 Nationality Act, 8 U.S.C.A. § 901.

until 1948. He testified that because of his mother's illness he would not have returned to the United States while she lived.

On June 1, 1948, after his mother had died, Lehmann executed a preliminary application for a non-immigrant visa, stating therein that the purpose of his trip to the United States was to visit his father for four months and listing his nationality as Swiss. A non-immigrant visa was accordingly issued and in August of 1948 he came to the United States for the apparent purpose of visiting his father. He first filed an application to regain his American citizenship but withdrew it and then instituted the declaratory judgment proceeding now under review.

The facts above recited are not in dispute. The controversy hinges on the single issue as to whether they established voluntariness or involuntariness with respect to Lehmann's service in the Swiss Army and his concomitant oath of allegiance to Switzerland.

Lehmann contends that the record established involuntariness; the Government disputes that contention.

Lehmann testified, in the District Court proceedings, that he only served in the Swiss Army because he was conscripted under Swiss law and would have been subjected to "penal sanctions" under that law had he refused to serve; his service was "compulsory" and "involuntary"; and he "had no option to do otherwise."

He also produced testimony in the form of a letter from the Swiss Consul in Philadelphia, Pennsylvania supporting his contention that his service in the Swiss Army was "compulsory" under Swiss laws. The letter stated that under the latter Lehmann "was under compulsion to comply with the order of mobilization" and that "the military status of dual citizens, i. e. of both the United States and Switzerland, is determined by the Convention between these two countries of November 11, 1937."

The Convention, published at 53 Stat. 1791, corroborates this statement in the Swiss Consul's letter and clearly establishes the authority of Switzerland to conscript Lehmann.

On the record as stated the District Court was of the opinion that "from all the evidence in this case Albert Hermann Lehmann has failed to establish by a fair preponderance of the evidence that his oath of allegiance to Switzerland and service in the Swiss Army were involuntary" and accordingly made the ultimate fact finding, earlier noted, that Lehmann had "expatriated himself from United States citizenship by service in a foreign army and by taking an oath of allegiance to Switzerland * * *."

▆ An analysis of the District Court's opinion discloses that its determination was premised on acts of omission, rather than commission, on the part of Lehmann with repect to his service in the Swiss Army and attending circumstances.

The omissions enumerated in the opinion were:

(1) On his 1941 visit to the American consulate in Basel, Lehmann failed to furnish proof of his birth in the United States and failed to inquire how he could establish his American birth.

(2) On that same visit he did not ask specifically for the protection of the American consulate and expressed no desire to register as an American citizen.

(3) He did not protest at the time he entered the Swiss Army or at the time he took the oath of allegiance.

With respect to these "omissions" it need only be said that they were utterly irrelevant to the critical issue of "voluntariness".

Under the Convention of 1937, as a dual citizen of the United States and Switzerland, Lehmann was obliged to submit to conscription in the Swiss Army and the American consulate in Basel could not by any attempted intervention in his behalf have contravened the terms of the Convention, nor could Lehmann's protestations, no matter how formally registered with either the American consul or the Swiss authorities, have done so. Had Lehmann presented his American birth certificate and registered as an American citizen or sought, and even gained, the "protection"

of the American consulate and had he protested to the latter and the Swiss officials —all these steps would have been nothing more than a "magnificent gesture", totally unavailing.

Anent the criticism of Lehmann's failure to act or speak, as far as the operations of the Swiss military conscription laws were concerned, it brings to mind the immortal lines:

> "The Moving Finger writes; and, having writ,
> Moves on; nor all your Piety nor Wit
> Shall lure it back to cancel half a Line,
> Nor all your Tears wash out a Word of it."
>
> Rubáiyát, Stanza 71

■ Similarly irrelevant to the issue presented were the further omissions adverted to by the District Court that, on Lehmann's visit to the American consulate on January 11, 1946, when he was advised that he had expatriated himself by reason of his Swiss Army service and accordingly could not obtain a requested visa or passport to the United States, "he made no protest nor did he make any statement that he desired retention of his American citizenship"; and, that when issued a Certificate of Loss of Nationality by the American consul on April 17, 1946, "Again, he made no protest that his service in the Swiss Army was involuntary nor did he make any statement of any kind to the consul expressive of a desire to either retain or regain his American citizenship."

Again, with respect to these "omissions", no action or inaction on the part of Lehmann in 1946 could be properly considered in determining the issue in this case; they could not serve as a "flashback" to establish voluntariness on Lehmann's part in 1939 when he registered for military service, or in 1941 when he entered into military service. Furthermore, if Lehmann had not expatriated himself prior to 1946

and was therefore wrongly advised by the American consul that he had done so, the Government's mistake of law cannot provide a basis for his expatriation, Podea v. Acheson, supra, since his then conduct was in reliance upon, and pursuant to, the Government's error.

■ Upon consideration of the record we are of the opinion that the District Court erred in its determination that Lehmann had expatriated himself from United States citizenship. The Government has failed to rebut the presumption that his entry and service in the Swiss Army as a result of his conscription were involuntary. With respect to the taking of the oath of allegiance to Switzerland, that action was but a concomitant of his conscription. Moreover, it was meaningless since by reason of his Swiss parentage he was already a citizen of Switzerland and his taking of the oath of allegiance did not change a pre-existing status. On that score it is significant that the Swiss oath of allegiance did not embrace a renunciation of his allegiance to the United States. Even had it done so, under our ruling in Doreau v. Marshall, supra, it would not have entailed "* * * [an] authentic abandonment of his own [United States] nationality",[8] since the taking of the oath was but an incident to the conscription to which Lehmann was subjected.[9]

■ The District Court premised its disposition on its finding that Lehmann's "* * * actions were entirely consistent with an election on his part to choose Swiss nationality and in nowise reflected an intensity of purpose on his part to retain his American citizenship." [109 F.Supp. 754.] The District Court erred in this respect. As was stated in Tomaya Kawakita v. United States, supra, 343 U.S. at pages 723, 725, 72 S.Ct. at page 956, 96 L.Ed. 1249, "The concept of dual citizenship recognizes that a person may have and exercise

---

8. "If by reason of extraordinary circumstances amounting to true duress, an American national is forced into the formalities of citizenship of another country, the sine qua non of expatriation is lacking. There is not authentic abandonment of his own nationality. His act, if it can be called his act, is involuntary. He cannot be truly said to be manifesting an intention of renouncing his country." Doreau v. Marshall, 3 Cir., 1948, 170 F.2d 721, 724.

9. Perri v. Dulles, 3 Cir., 206 F.2d 586.

rights of nationality in two countries *and be subject to the responsibilities of both"*, and "As we have said, dual citizenship presupposes rights of citizenship in each country. *It could not exist if the assertion of rights or the assumption of liabilities of one were deemed inconsistent with the maintenance of the other."* (Emphasis supplied.)

Lehmann's actions were certainly within the periphery of the principles stated. As a Swiss citizen he was required to submit to its conscription laws and that apart from the factor that he would have been subjected to punishment had he done otherwise. We can see nothing in the record which could possibly justify a finding that Lehmann did aught but what was obligatory upon him by virtue of his dual citizenship under the laws of Switzerland. Further, the evidence is undisputed that in 1941 before his service in the Swiss Army he attempted to return to the United States so as to join the United States Air Force. That action certainly demonstrated his loyalty and allegiance to the United States.

It was the District Court's view that Lehmann bore the burden of establishing that his service in the Swiss Army and his taking of an oath of allegiance to Switzerland were involuntary.[10] In that respect the District Court erred. On the contrary, as we earlier stated, conscription into a foreign army of one holding dual citizenship is sufficient to establish prima facie that the entry into and the service in that Army were involuntary. As already noted the Government failed in its obligation to rebut that presumption. Additionally, it may be noted that it has long been established that the burden of proving expatriation generally is upon the defendant who affirmatively alleges it and the burden is a "heavy" one. Bauer v. Clark, 7 Cir., 1947, 161 F.2d 397, certiorari denied 332 U.S. 839, 68 S.Ct. 210, 92 L.Ed. 411, rehearing denied 332 U.S. 849, 68 S.Ct. 342, 92 L.Ed. 419. The Government has completely failed in this respect.

We cannot refrain from the comment that the Government's position in this case is an anomalous one in view of its recent action in Mandoli v. Acheson, 1952, 344 U.S. 133, 73 S.Ct. 135. There the Government had persuaded the District Court to rule that the mere fact of conscription into the Italian Army of one holding dual citizenship in the United States and Italy was insufficient to establish involuntariness. However, it abandoned its position on appeal to the United States Court of Appeals for the District of Columbia, conceding that the service of a dual citizen in the Italian Army and the taking of an oath of allegiance to Italy as a result of conscription were involuntary. The Supreme Court noted that fact with apparent approval in its opinion,[11]

10. It must be noted that the Government did not assert nor rely on Section 402, 8 U.S.C.A. § 802, as lending any support to its contention that Lehmann had lost his citizenship. That Section provides that a national of the United States who was born in the United States "shall be presumed to have expatriated himself under subsection (c) or (d) of section 401, when he shall remain for six months or longer within any foreign state of which he or either of his parents shall have been a national according to the laws of such foreign state * * * and such presumption shall exist until overcome whether or not the individual has returned to the United States." On that score it must be observed that it was held in Tomaya Kawakita v. United States, 1952, 343 U.S. 717 at page 730, 72 S.Ct. at page 959, 96 L.Ed. 1249, "Sec-

tion 402 does not enlarge § 401 (c) or (d); it creates a rebuttable presumption of expatriation; and when it is shown that the citizen did no act which brought him under § 401 (c) or (d), the presumption is overcome. On that showing the person never loses his American nationality. * * * In other words, once it was shown that petitioner was not expatriated under § 401 (c) or (d), the force of § 402 was spent."

11. The Supreme Court, in referring to the fact that the District Court had also found that Mandoli's service in the Italian Army, under conscription, was voluntary and that he then took an oath of allegiance to the King of Italy, stated, 344 U.S. at page 135, 73 S.Ct. at page 136:

and referred therein in footnote 3, 344 U.S. at page 135, 73 S.Ct. 135, to 41 Op.Atty. Gen. Op. No. 16 (May 8, 1951). In the latter, the Attorney General held that a United States citizen required by the law of another country (Italy) to serve in its armed forces and, while so serving, to take an oath of allegiance to its sovereign, acted under duress and accordingly did not expatriate himself by his conduct.

We can see no valid reason for making any distinction between service by conscription in the Italian Army and service by conscription in the Swiss Army, for in both instances the conscript acts under compulsion of law and the duress of penal sanctions in the event of non-compliance.

One final observation may be made.

■ The Supreme Court has in the recent past afforded an illuminating guide in the consideration of issues similar to those presented here.

In speaking of the grant of citizenship—by the naturalization process—the Supreme Court stated in Schneiderman v. United States, 1943, 320 U.S. 118, 125, 63 S.Ct. 1333, 1336, 87 L.Ed. 1796: "To set aside such a grant the evidence must be 'clear, unequivocal, and convincing'—'it cannot be done upon a bare preponderance of evidence which leaves the issue in doubt'. * * * This is so because rights once conferred should not be lightly revoked. And more especially is this true when the rights are precious and when they are conferred by solemn adjudication, as is the situation when citizenship is granted."

These principles were reaffirmed in Baumgartner v. United States, 1944, 322 U.S. 665, 64 S.Ct. 1240, 88 L.Ed. 1525. There the Supreme Court stated, 322 U. S. at page 670, 64 S.Ct. at page 1243:

"The measure of proof requisite to denaturalize a citizen was before this Court in Schneiderman v. United States, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796. It was there held that proof to bring about a loss of citizenship must be clear and unequivocal.

"The Government abandoned the first ground because the Attorney General ruled that such service in the Italian ar-

We cannot escape the conviction that the case made out by the Government lacks that solidity of proof which leaves no troubling doubt in deciding a question of such gravity as is implied in an attempt to reduce a person to the status of alien from that of citizen."

It cannot be gainsaid that what is true of the rights of a naturalized citizen is equally, if not more, true of the rights of one who is blessed with the gift of citizenship by the Constitution of the United States by virtue of his birth in the United States.

For the reasons stated the judgment of the District Court will be reversed with directions to enter an order declaring that Albert Hermann Lehmann is a citizen of the United States.

my by one similarly situated could 'only be regarded as having been taken under legal compulsion amounting to duress.'"